LUTHER KOUNTZE and Others, Appellants, *v.* EDWARD T. KENNEDY, Executor of, etc., Respondent.

*Fraud* — *evidence necessary to establish it* — *when knowledge of the falsity of the representations need not be shown* — *good faith.*

In an action brought to recover the damages resulting from an alleged fraud, the burden of proof is upon the plaintiff to establish separately and independently representation, falsity, scienter, deception and injury.

Where all the requisite elements of such an action are present, except knowledge on the part of the person making the representations of their falsity, no recovery can be had unless such person assumed or intended to convey the impression that he knew such representations to be true, though conscious that he had no such knowledge.

What evidence does not establish bad faith in making representations.

APPEAL by the plaintiffs, Luther Kountze, Herman Kountze and Charles B. Kountze, from a judgment of the Supreme Court in favor of the defendant, entered in the office of the clerk of the city and county of New York on the 19th day of May, 1892, upon the report of a referee, dismissing the plaintiffs' complaint on the merits, and for costs.

The action was brought to recover $100,000 damages alleged to have resulted to the plaintiffs from certain fraudulent representations by which they were induced to purchase certain stock.

*Wheeler H. Peckham* and *George W. Van Slyck*, for the appellants.

*Wm. B. Hornblower* and *Wm. R. Bronk*, for the respondent.

PARKER, J. :

Defendant's testator, John P. Kennedy, was during the period covering the transaction in controversy, and for a number of years prior thereto, the president of the " Howe Machine Company."

He was also interested in other enterprises, one of which brought about an acquaintance with Kountze, one of the results of which was a request by Kountze that Kennedy advise him of any business opportunities in which it might be deemed desirable to invest money. Prior to November, 1883, Mr. Kennedy, although president of the corporation, had only a nominal interest in it, having accepted the position at the request of Cornelius K. Garrison, who owned the controlling interest in the stock of the corporation. About that time a Mr. Parmly and Mr. Wheeler purchased Garrison's interest in the corporation.

For his stock, which numbered thirty thousand (30,000) shares, they paid $36,000, and for his accounts against the company, which were adjusted at $250,000, they issued and delivered to him the first mortgage bonds of the corporation in a like amount. Kennedy was then invited to join with the purchasers in an active participation in the company's affairs.

This he consented to do, and to that end purchased one-third of the thirty thousand (30,000) shares of stock, for which he paid $12,000. To secure the funds deemed to be necessary for the conduct of the business, it was determined to issue and sell second mortgage bonds aggregating $200,000.

Recalling the request of Mr. Kountze, that he be informed of opportunities for investment, Kennedy told him of the plans of the corporation, at the same time assuring him that as soon as the matter should be in shape to present to him it would be done, and an opportunity afforded for the purchase of the bonds.

One hundred thousand dollars of the bonds issued were purchased by the plaintiffs, who received as a bonus stock of the corporation contributed by owners of the thirty thousand (30,000) shares equal to the par value of the bonds.

Before the purchase was consummated, Kennedy was requested to furnish Kountze with a statement of the company's assets and liabilities.

In pursuance of such request Kennedy subsequently handed him a statement which is as follows :

### " ASSETS.

| | |
|---|---:|
| " Real estate, Bridgeport ..................... | $460, 000 |
| " " " elsewhere ....................... | 34, 000 |
| " Personal property............................. | 205, 000 |
| " New building and machinery .................. | 35, 000 |
| " Bills receivable, accounts..................... | 300, 000 |
| | " $1, 034, 000 |

### " LIABILITIES.

| | |
|---|---:|
| " First mort. bonds ........................... | $320, 000 |
| " Less sinking fund............................. | 50, 000 |
| | " $270, 000 |
| " Savings bank................................ | 80, 000 |
| " Bills payable and open accounts............... | 150, 000 |
| | " $500, 000 " |

The referee has found, and upon evidence sufficient to support it, that the statement as to the assets was substantially true. But with reference to the liabilities he found that the balance sheet of the corporation showed an indebtedness at the time of the preparation of the statement of $571,001.31, whereas the statement gave the liabilities at $500,000.

He further finds that the excess, amounting to upwards of $70,000, was deducted because it was supposed that they were not actual liabilities of the company, or did not properly belong to bills payable and open accounts. The referee further found that there were certain small liabilities, aggregating $8,262.67, which had not been

entered upon its books at the time of the sale of the bonds. That another item not included in the statement consisted of a claim against the company by Mrs. Stockwell, then in suit, upon which the company denied liability, but subsequently compromised at the sum of $15,000, which it was agreed should be paid in installments.

Another item not included in the statement of liabilities of the company consisted of a claim on a draft for $62,475, which claim was then in suit, the property of the corporation having been attached at the time of its commencement. With reference to all of these items the referee found in substance that the company insisted that there was no liability on its part, and that collection was resisted by it, Kennedy and the other officers of the company having reasonable cause to believe that it would not be held liable for them.

He further found that when Kennedy presented the statement and made the representation set forth in the complaint, he had no intent to deceive or defraud the plaintiffs, but believed the same to be in all respects true, and that he had reasonable ground for believing it to be true. If the findings to which we have referred are to stand, the judgment dismissing the complaint should be affirmed. The plaintiffs, claiming to have been defrauded, had one of three courses open to them :

(1) To rescind the transaction, offering to restore what they had received, and commence a suit for the recovery of the moneys paid.

(2) To bring a suit in equity to obtain a rescission of the contract, and to recover what they had parted with, the pleadings containing an offer to restore what they had received.

(3) To keep what they had received and to sue for damages for the fraud.

The plaintiffs chose the latter remedy, and thereby assumed the burden of establishing separately and independently five things, representation, falsity, scienter, deception and injury.

If any one of these essential constituents of an action of this character be lacking there can be no recovery. (*Brackett* v. *Griswold*, 112 N. Y. 467.)

It is both proven and found that the representations were made, that they were untrue, that plaintiffs were deceived thereby, and

that damage resulted, but it is not found that defendant had knowledge that they were untrue; on the contrary, it is affirmatively found that he believed them to be true, and had reasonable ground for his belief.

IN addition to the general rule stated by the court in the case last cited, there have been before the courts many times, controversies where all the requisite elements of such an action were found to be present except knowledge on the part of the person making the representations of their falsity, and its absence has universally been held to prevent a recovery. (*Marsh* v. *Falker*, 40 N. Y. 565; *Chester* v. *Comstock*, Id. 575, 576, note; *Oberlander* v. *Spiess*, 45 id. 175; *Wakeman* v. *Dalley*, 51 id. 27; *Duffany* v. *Ferguson*, 66 id. 484; *Daly* v. *Wise*, 132 id. 306.) An exception to this rule is where the person making the representations assumed or intended to convey the impression that he knew them to be true though conscious that he had no such knowledge (*Marsh* v. *Falker*, *supra*), but that question will be considered, so far as necessary in this case, later on.

We are thus brought to the question whether the findings which assert the good faith of Kennedy, and that the circumstances attending the making up of the statement were of such a character as to afford him reasonable ground upon which to rest his belief in the truth of the statement, have such support in the evidence as require the court to affirm them.

Kennedy did not make up the statement personally, but requested the secretary to make it and to make it conservative, and to submit it to the counsel of the company for his approval.

The secretary testifies that he prepared the statement with great care, and when it was completed he, believing it to be truthful, submitted it to Mr. Wheeler, the company's general counsel, who looked over it carefully and revised it, and then it was handed to Mr. Kennedy. When it came into his hands the bills receivable and accounts were put at $400,000, and Kennedy inquired of the secretary whether he thought that a conservative estimate, and on being answered that they aggregated more than that, he suggested, in order to be on the safe side, that they be estimated at $300,000. This was acquiesced in, the statement accordingly corrected, and subsequently submitted to Kountze by Kennedy. Of course there was no evidence to contradict the testimony of Kennedy and the secretary touching the

manner in which the statement was made up, and the situation was such that necessarily there could be none. But the referee had the parties before him, and was thus enabled to form an opinion as to the probable truthfulness of the alleged history, of the acts and sayings of the several persons taking part in the preparation of the statement. If fully believed, it tended very strongly to support the conclusion at which the referee arrived. It tends to show that Kennedy not only believed the information which he gave to Kountze to be correct, but also that he had taken reasonable precautions against the making of an inaccurate statement.

Personally, he was unfamiliar with the books, and he applied to the person who had them in charge, knew about them, and was apparently thoroughly competent to acquire and furnish the desired information. A still further precaution was taken of having the statement examined and approved by their counsel.

Further support of the findings is furnished by the testimony of the secretary, assigning the reason which induced him to fix the liabilities at about $71,000 less than that shown by the balance sheet, and also the ground which induced the omission of the further liabilities which the referee found in fact existed.

In order to appreciate his testimony in that respect, it will be well to bear in mind that the liabilities stated to exist were comprised in three items :

| | |
|---|---:|
| First mortgage bonds .................................. | $270,000 |
| Savings bank ......................................... | 80,000 |
| Bills payable and open accounts ..................... | 150,000 |
| Total ............................................... | $500,000 |

The first item was correctly stated, the second item represented the principal of the debt due the savings bank, in addition to which the company owed it $10,018.15, which was an open account, and included in the item of " bills payable and open accounts, $150,000," on the statement presented by Kennedy to Kountze.

Therefore, the error, if any there was in stating the indebtedness at a less amount than shown by the books, must be found in that item. The books show the liabilities on March 1, 1884, as follows :

Bills payable :

| | | |
|---|---:|---:|
| City Savings Bank.......................... | $80,550 | 80 |
| Bridgeport Bank............................ | 15,000 | 00 |
| A. B. Stockwell............................ | 10,000 | 00 |
| Indianapolis Cabinet Co..................... | 5,537 | 10 |
| Sundry bills payable........................ | 79,477 | 89 |
| | $190,565 | 79 |

Accounts payable :

| | | | | |
|---|---:|---:|---:|---:|
| C. K. Garrison................... | $242,237 | 81 | | |
| Howe Sewing Machine Co.......... | 2,625 | 96 | | |
| Bridgeport Sav. Bank (int.)........ | 1,800 | 00 | | |
| Howe St. property (rent).......... | 239 | 00 | | |
| Sundry accounts payable.......... | 98,281 | 75 | | |
| | | | 345,184 | 52 |
| Total................................. | | | $535,750 | 31 |

From these items the secretary made the following deductions :

| | | | | |
|---|---:|---:|---:|---:|
| First mortgage bonds.............. | $270,000 | 00 | | |
| City Savings Bank................ | 80,550 | 80 | | |
| A. B. Stockwell.................. | 10,000 | 00 | | |
| Bridgeport Bank.................. | 15,000 | 00 | | |
| "        " (int.)............. | 1,800 | 00 | | |
| Indianapolis Cabinet Co........... | 5,537 | 10 | | |
| Howe Sewing Machine Co......... | 2,625 | 96 | | |
| Howe St. property (rent).......... | 239 | 00 | | |
| Total deductions........................ | | | 385,752 | 86 |

Leaving a balance of bills and accounts payable of. **$149,997 45**

While the statement presented to Mr. Kountze showed....................................... **$150,000 00**

The two first items, namely, first mortgage bonds, and indebtedness to City Savings Bank, were properly deducted, because separately stated on the paper given to the plaintiffs.

As to the other items, he testified that he deducted the Stockwell claim of $10,000 because it was for a draft drawn on the "Howe

Machine Company " by Stockwell, and accepted by the treasurer without authority. Subsequently the company successfully defended the suit brought upon it. The Bridgeport Bank items, principal and interest, were deducted because the money never came into the possession of the company or benefited it, which claim the company not only refused to pay, but it never was paid, nor has it ever been called upon by the bank to pay it since their first refusal. The " Indianapolis Cabinet Company " item, he says, he deducted because the " Howe Machine Company " did not in fact owe it. That such apparent indebtedness consisted of a note which he regarded as accommodation paper. It was given to the cabinet company pursuant to a contract with it, that they should use the paper, and furnish woodwork for it. When the woodwork should be received, which event had not yet happened, then the company would have property equal in value to the face of the note. With reference to the Howe Sewing Machine Company item, he testified, that while it appeared on the books as a liability, in reality that company was indebted to the Howe Machine Company. The last item, " Howe Street property (rent)," he stated to be simply a transfer account to show the receipts and disbursements of a block of houses.

This evidence, if believed, justified the referee in reaching the conclusion, that in stating the liabilities at a less sum than they appeared on the books, the secretary acted in good faith, and Kennedy had reason to believe that the deductions from the apparent liabilities were justly made. This brings us to a consideration of the items which the referee has found to have been liabilities not appearing on either the books or statement.

The first consists of various small items, aggregating $8,262.67, which were placed on the books subsequent to the making of the statement. Without stopping to consider the several items making up such amount, it may be said generally, that some of them were for bills rendered and paid subsequent to the making of the statement; that over one-half of it consisted of taxes which were not entered upon the books until May 26, 1884. And further, it should be said that it nowhere appears that the secretary knew of the existence of such items when he prepared the statement, nor is there any direct evidence that Mr. Kennedy knew about them. The referee found that there was an indebtedness to Mrs. Stockwell of $15,000, which

was not included in the statement. This claim, which was originally for $100,000, was founded upon a bond purporting to be given by the "Howe Machine Company" as an indemnity to secure Mrs. Stockwell for any mortgage which she might give for the benefit of the "Howe Machine Company." The books contained no reference to its existence, and liability thereon was denied by its officers.

The only mortgage than she ever executed was to the "Bridgeport Savings Bank" to secure the sum of $15,000, which has been referred to elsewhere as deducted from the liabilities by the secretary on the ground, as he alleges, that the money never came into the hands of the company.

Some time in March or April, 1884, and necessarily after the statement was made, a suit was brought on the bond, which was compromised April nineteenth following, by the giving of a note by the company for $15,000, payable in installments. Whether any demand was made upon the officers of the company for the payment of any sum on this bond prior to the making of the representations, does not appear, nor does it appear that Kennedy knew anything about it prior to the commencement of the suit. The referee further found that the company was indebted to the "Credit Company, Limited," in the sum of $62,475, which was not included in the statement of liabilities.

This liability arose under the following circumstances: A. B. Stockwell, while in London in 1877, drew drafts in such amount upon the "Howe Machine Company," which were accepted by his brother, who was then treasurer of the company.

The proceeds of the drafts were applied to the individual use of. the drawer, the company never receiving any benefit from them, and their acceptance by the treasurer was without authority.

A recovery was subsequently had on the drafts, and the judgment finally affirmed by the court of last resort, the case being reported in 54 Conn. 357, the chief justice of the court dissenting from the conclusion reached by his brethren.

Whether Kennedy, at the time of making the statement, had his attention drawn to the pending suit, or had it in mind, does not appear. There is no evidence on the subject. And its omission by the secretary in making up the statement was said to be justified on the ground that nothing appeared on the books in reference to it,

the suit, which was of long standing, being regarded by the company to be without merit, their opinion being based upon the advice given by competent and leading lawyers, both in New York and Bridgeport, that the claim was without validity and could not be enforced. A further circumstance tending to show Kennedy's confidence in the enterprise in which plaintiffs were embarking with him, may be found in his loans to the company and investment in its bonds and stock. The first investment was about four months prior to the making of the statement, when he paid $12,000 for a third interest in the stock; subsequent to that and prior to March, 1884, he loaned the company $22,200. He purchased fifty of the same class of bonds as those bought by the plaintiffs, paying $40,000 therefor. Still later, and on October fifth, he paid $7,000 for ten bonds, and December twenty-seventh following he paid $1,400 for two bonds. June 10, 1884, he paid $2,000 for 400 shares of stock, and made a standing offer for the company's stock at five dollars per share. He also loaned or indorsed for the company to the amount of $70,000, of which $25,000 still remains unpaid. A further circumstance may be properly alluded to. When Kennedy handed the statement to Kountze he requested him to go to Bridgeport and look over the property and affairs of the corporation. This he did, and while there it is not pretended that he was not afforded every facility for making a thorough investigation.

We have thus alluded to some of the evidence which tends to support the conclusion of the referee, that this remarkably inaccurate statement of liabilities, when presented to Kountze by Kennedy, was believed by the latter to be true, and that there was reasonable ground upon which to found such belief. The record is not without evidence supporting contrary inferences. But it is not of such a character as to warrant this court in setting aside the findings complained of, on the ground that such determination is against the weight of evidence. The further point is made that the referee erred in refusing to find " that the said representations of the defendant to the plaintiffs were so made as to convey an impression to the plaintiffs that the defendant had actual knowledge of the truth thereof." It is a significant fact that although Mr. Kountze was examined and cross-examined in relation to the conversations had between him and Mr. Kennedy prior to, at the time of giving, and

subsequent to the statement, he did not suggest that Kennedy had assumed to have personal knowledge of the condition of the company, or said that he was making statements of his own personal knowledge. Subsequently, and on rebuttal, he gave testimony tending in that direction. His testimony in that respect was afterwards denied by Kennedy. The appellant seeks to draw a contrary inference from the testimony of Kennedy on cross-examination. But after examining it in connection with the rest of his testimony on that subject, and considering it in connection with Kountze's evidence, the conclusion is reached that the refusal to find as requested has such support in the evidence as requires an affirmance of the determination of the referee in such respect. We have examined the other exceptions relied on by the appellants, but they do not need discussion.

The judgment should be affirmed, with costs.

O'BRIEN and FOLLETT, JJ., concurred.

Judgment affirmed, with costs.